# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**JEFFREY GLEN STOKES,**
**Plaintiff,**

**vs.**                                              **1:05cv80/MMP/MD**

**DR. GERLECZ and**
**DR. SHIELDS,**
**Defendants.**

---

## REPORT AND RECOMMENDATION

This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon the special report filed by defendants Dr. Shields and Dr. Gerlecz.[1] (Doc. 46).  The pro se plaintiff, who is proceeding *in forma pauperis* in this action,[2] filed a response in opposition to the special report. (Doc. 57).[3]  On October 6, 2006, this court entered an order advising the parties of the importance and ramifications of Rule 56 summary judgment consideration, and informing the parties that the special reports would be construed as motions for summary judgment as of November 6, 2006 (doc.

---

[1]Plaintiff's claims against the third defendant, Dr. Allis, were dismissed due to his failure to exhaust administrative remedies against this defendant.  (See Doc. 45, 55, 60 & 61).

[2]Court records reflect that plaintiff paid the initial partial filing fee of $6.00, but failed to make any additional payments.  Therefore, plaintiff still owes $244.00 to the court.  DOC records indicate that he was released on April 19, 2006.

[3]In plaintiff's response, he essentially states that he cannot read or understand the doctors' handwriting, and that he does not understand any of the medical terms used in the defendants' exhibits.  Plaintiff was released from DOC custody on April 19, 2006.  Although he has been in jail at least some of the time since then, there is nothing in the record indicating that he attempted to secure counsel or do additional research into his case.  Plaintiff's response does not attempt to even rebut any of the facts offered by the defendants.

58).  The court withheld consideration of the motion for summary judgment until the ruling on the defendants' motion to dismiss was entered on March 22, 2007.  (Doc. 61).

Upon review of the submissions of the parties, it is the opinion of the undersigned that the defendants' motion for summary judgment should be granted.

## Background

Plaintiff was an inmate incarcerated with the Florida Department of Corrections ("DOC") at the time he filed his complaint, who has since been released. Defendant Dr. Shields is a dentist licensed in the state of Florida and employed by the Florida DOC as the director of dental services.  Defendant Dr. Gerlecz is a dentist licensed in the state of Florida and employed by the DOC as a dentist at Washington Correctional Institution.

In his amended complaint (doc. 5) (henceforth "complaint"),[4] plaintiff complains that on March 25, 2002, while incarcerated at Century Correctional Institution ("CCI"), he began experiencing pain in the left side of his jaw.  (Doc. 8, complaint at ¶ 1).  He was diagnosed with temporomandibular joint disease ("TMD"), prescribed ibuprofen and provided with a mouthpiece.  On May 23, 2000, while incarcerated at the North Florida Reception and Medical Center, plaintiff began to experience pain on the right side of his jaw.  Although not entirely clear from the complaint, it appears that an arthrocentesis was performed in December of 2000. (Compl. ¶¶ 7-9).

On March 15, 2001, he states that arthroplasty surgery was performed. Plaintiff was in continual pain after this surgery and states that he was unable to chew food.  (Compl. ¶¶ 10-12).   He was provided physical therapy and pain

---

[4]The allegations in this complaint were sworn under penalty of perjury on August 16, 2005.  The original complaint was filed on April 18, 2005.

management, but in January 2002, plaintiff was advised that nothing more could be done.  (Compl. ¶¶ 13-14).

An MRI was performed on March 26, 2002, and on April 2, 2002 both sides of plaintiff's jaw were x-rayed.  On April 16, 2002, Dr. Wenk, who is not a named defendant in this action, read the MRI to show that "metal shavings" remained in plaintiff's jaw.  A Dr. Mandell, who also is not a named defendant in this action, advised plaintiff on September 19, 2002 that he was permanently disabled and that no further surgery could be performed to correct the problem.  (Compl. ¶¶ 15-19).

Plaintiff alleges that as of September 3, 2003, Dr. Shields knew from reviewing plaintiff's dental file in order to respond to a grievance he had filed, that plaintiff continued to experience pain, was unable to fully open his jaw or chew and grind solid foods, but refused to order any corrective treatment. As of April 21, 2005, when Dr. Shields was again required to review plaintiff's file, he knew that plaintiff was still in pain from his TMD and the metal shavings in his jaw, but refused to order any corrective treatment or inform Dr. Gerlecz of the need for a consultation for corrective surgery.  As of June 17, 2005 when Dr. Shields reviewed plaintiff's dental file for a third time, he knew that Dr. Gerlecz had filed no requests for corrective surgery.  (Compl. Statement of facts ¶¶ 21-23; statement of claim ¶¶ 1-16)).  Plaintiff maintains that Dr. Gerlecz never requested any corrective surgery for him, despite the knowledge as plaintiff's primary dental care provider that it would have been his responsibility to submit a consult form for treatment that was beyond his capacity to perform, and knowing that the metal shavings in plaintiff's jaw were preventing it from fully opening, and were causing plaintiff pain and inability to chew his food. (Compl. Statement of facts ¶¶ 24-26, statement of claim ¶¶ 17-31).  Finally, plaintiff alleges that Dr. Allis failed to notify and request of DOC officials that corrective surgery be performed on plaintiff because plaintiff was in pain from the previous surgery. (Compl. Statement of claim ¶¶ 32-41).  Plaintiff seeks declaratory relief that a corrective procedure existed since 2000, injunctive relief that a corrective

procedure be performed, and monetary damages for his years of pain and suffering in an amount dependent upon the success of the procedure.

Defendants' presentation of plaintiff's dental history paints a different picture and is supported by affidavits and copies of plaintiff's medical records appended to their special report. Their submissions reveal that on March 27, 2000, Plaintiff presented at the Century Correctional Institution dental department with a complaint of jaw pain that started nine days prior. The institutional dentist noted crepitus, (a creaking or grating or popping sensation or sound) in the left TMJ[5] and noted that plaintiff could open his mouth two centimeters. An impression was made of plaintiff's mouth for a bite splint which was provided to him on March 31, 2000. The purpose of this type of splint is to help promote muscle relaxation in the jaw muscles. (Defendants' Exhibits B, B2)(Defendants' Exhibit C1-Shields Affidavit).

On April 5, 2000, a consult request was made for Plaintiff to be seen at the North Florida Reception Center (NFRC). On May 3, 2000, Plaintiff was evaluated by Department of Corrections Oral Maxillofacial surgeon Dr. Parker Allis. Dr. Allis found that Plaintiff exhibited symptomatic left TMJ and recommended x-rays, a mechanical dental diet[6] and the pain reliever Motrin. (Defendants' Exhibit B2-B3).(Defendants' Exhibit C1-Shields Affidavit).

On May 3, 2000, plaintiff's facial bones and left and right mandibles were x-rayed. Plaintiff was noted to have normal facial bones and normal mandibles. On May 8, 2000, plaintiff's right and left TM joints were x-rayed with open and closed mouth view. No evidence of arthropathy (disease or abnormality of the joint) was

---

[5]TMJ refers to the Temporal Mandibular Joint located on both sides of the jaw where the jaw connects with the skull.

[6]The Mechanical Dental Diet is a special diet in which the food is finely chopped up to reduce the amount of masticatory jaw movement and force needed to process food. Dr. Shields states, without citation of authority, that a Mechanical Dental Diet is a recognized and approved diet method for patients who claim to have pain in chewing their food.

Page 5 of  19

evident and the impression reflected a negative study. (Defendants' Exhibit B5-B6)(Defendants' Exhibit C1-Shields Affidavit).

On May 9, 2000, plaintiff was examined by Dr. Shaik of the University of Florida's College of Dentistry, Department of Oral and Maxillofacial Surgery (UFCD) at NFRC.[7]  Dr. Shaik recommended that plaintiff be provided the pain reliever Ibuprofen, a liquid diet for 2 weeks, an occlusal splint and a followup in two weeks. (Defendants' Exhibit B7)(Defendants' Exhibit C1-Shields Affidavit).

On May 23, 2000, Dr. Shaik again examined plaintiff, noted his report of negative improvement and localized pain of the left TMJ.  Dr. Shaik again recommended plaintiff be provided with Ibuprofen and a liquid diet for two more weeks and that an MRI be performed.  (Defendants' Exhibit B8)(Defendants' Exhibit C1-Shields Affidavit).

On June 28, 2000, an MRI of plaintiff's left and right TMJ was taken at the Imaging Center at San Marco in Jacksonville.  The MRI report noted probable anterior displacement with reduction in the right TMJ. (Defendants' Exhibit B9) (Defendants' Exhibit C1-Shields Affidavit).

On July 12, 2000, Dr. Allis documented plaintiff's complaint of pain and the prescription for Motrin and renewed diet pass. The Mechanical Dental Diet was again renewed on August 10, 2000 and on September 6, 2000 through November 5, 2000. (Defendants' Exhibit B10)(Defendants' Exhibit C1-Shields Affidavit).

On October 10, 2000, Plaintiff was examined by Dr. Winton of UFCD for re-evaluation of his left side TMJ pain. Dr. Winton recommended continued conservative management of soft diet, warm compresses and NSAIDS (Non Steroidal Anti Inflammatory Drugs), and if no improvement, to return to the clinic for an arthrocentesis. On November 3, 2000, Dr. Allis documented the renewal of the

---

[7]At this time, the University of Florida College of Dentistry, Department of Oral-Maxillofacial Surgery and Shands Teaching Hospital were providing oral maxillofacial services for the Department of Corrections under a contractual basis.

Mechanical Dental Diet from November 3, 2000 to January 7, 2001 as well as the prescription for Motrin for plaintiff.  (Defendants' Exhibit B11)(Defendants' Exhibit C1-Shields Affidavit).

An arthrocentesis, which is a procedure whereby a needle and syringe is inserted into the joint and irrigated, was performed on the plaintiff on December 21, 2000.  Plaintiff was seen one week after this procedure by Dr. Wagoner of UFCD. Dr. Wagoner noted plaintiff's report of no improvement in the left TMJ and report of continued pain. Dr. Wagoner recommended that plaintiff be continued on the soft mechanical diet and Motrin with a followup in one week.  (Defendants' Exhibit B12-B13) (Defendants' Exhibit C1-Shields Affidavit).

On January 9, 2001, plaintiff was again seen by Dr. Wagoner complaining of no improvement in pain. Dr. Wagoner discussed plaintiff's options including arthroscopy versus arthroplasty with him.  On January 16, 2001, plaintiff returned to the clinic complaining of popping in the left TMJ.  Dr. Wagoner recommended a continued mechanical dental diet and Motrin. On February 6, 2001, plaintiff reported to Dr. Wagoner that the popping and clicking had stopped but the pain continued. Dr. Wagoner recommended continuation of soft diet and Motrin and noted he would seek approval for possible left TMJ arthroplasty. (Defendants' Exhibit B14-B15)(Defendants' Exhibit C1-Shields Affidavit).

On March 13, 2001, Dr. Wagoner again discussed plaintiff's treatment options, including TMJ arthroplasty, with him.  He explained to plaintiff that this procedure might not improve plaintiff's condition. Dr. Wagoner noted in plaintiff's records that he understood this, and scheduled him for bilateral TMJ arthroplasty surgery. (Defendants' Exhibit B16)(Defendants' Exhibit C1-Shields Affidavit).

On March 15, 2001, Plaintiff underwent a bilateral TMJ arthroplasty.  Plaintiff signed the Anesthesia and Operative Permit, acknowledging that the operation was being performed in anticipation that it could be a benefit to him but acknowledging

that his physical and/or mental condition could become better or worse or unaltered. (Defendants' Exhibit B17-B22)(Defendants' Exhibit C1-Shields Affidavit).

On April 2, 2001, Dr. Allis noted plaintiff's complaints of bilateral pre-auricular pain (the area in front of the ear) and prescribed the pain reliever Tylenol Elixir with codeine for plaintiff. (Defendants' Exhibit B23)(Defendants' Exhibit C1-Shields Affidavit).

Plaintiff was examined by Dr. Winton on April 3, April 10, and April 24, 2001. Plaintiff was noted to have decreased pain on the right side of the jaw but continued left sided pre-auricular pain usually in the evenings.  Plaintiff denied any jaw opening click or pop, and his mouth opening was noted to be at 26 millimeters, which was an improvement.  Plaintiff's "p.m., pain" was noted to be likely caused from grinding or clenching of the teeth.  It was explained to plaintiff that his current condition could be long term with gradual versus no improvement. Plaintiff indicated he understood.  During these visits, plaintiff was provided a full liquid diet, Tylenol, Motrin and the muscle relaxant Flexoril. (Defendants' Exhibit B24-B25)(Defendants' Exhibit C1-Shields Affidavit).

On April 30, 2001 and May 9, 2001, Dr. Allis documented plaintiff's complaints of pain and prescriptions for Tylenol Elixir with codeine.  On May 15, 2001, Plaintiff was again examined by Dr. Winton.  It was explained to plaintiff that there were no surgical options to reduce his symptoms and that his current condition may continue.  Dr. Winton recommended continuation with non-surgical management. Plaintiff understood and was agreeable to the current treatment plan.  (Defendants' Exhibit B26)(Defendants' Exhibit C1-Shields Affidavit).

Plaintiff continued to complain of pain.  On December 28, 2001, he was referred to physical therapy for his complaints of jaw pain.[8]  Plaintiff was also provided Tylenol and a puree diet and a night mouth guard.  The puree diet was

---

[8]The consultation request dated January 3, 2002 also noted that plaintiff had been seen by a psychologist for chronic pain management. (Defendants' Exhibit B38).

extended from February 25, 2002 to April 25, 2002.  On March 11, 2002, plaintiff was provided a prescription for the pain reliever Celebrex. (Defendants' Exhibit B35-B41) (Defendants' Exhibit C1-Shields Affidavit).

On April 2, 2002, plaintiff was examined by Dr. Wenk of UFCD who noted that plaintiff reported that the prescription Celebrex helped some. Dr. Wenk recommended a followup in one week and a MRI. (Defendants' Exhibit B42)(Defendants' Exhibit C1-Shields Affidavit).

On April 10, 2002, a MRI was conducted on plaintiff for evaluation of the TMJ disc positioning.  Dr. Franco noted the presence of a sensitivity artifact about both temporal joints that obscured the evaluation of plaintiff's TMJ. Dr. Franco conducted plain film x-rays on plaintiff and failed to find any metallic foreign body in the TMJ region.  Dr. Franco noted that sometimes metallic shaving from surgery could create artifacts in the MRI.  Dr. Franco did not state that metallic shavings were present in plaintiff's TMJ.  The subsequent x-ray report on May 9, 2003 does not denote the presence of foreign bodies in plaintiff's TMJ.  None of the specialists in this case have attributed foreign bodies to plaintiff's TMJ difficulties. (Defendants' Exhibit B43) (Defendants' Exhibit C1-Shields Affidavit).

On April 16, 2002, plaintiff was again examined by Dr. Wenk who noted that plaintiff reported that the prescription drug Celebrex helped but that he still had pain. Dr. Wenk recommended plaintiff continue with the Celebrex at an increased dosage. Dr. Wenk did not recommend surgery because plaintiff demonstrated a mouth opening of 25 millimeters and an improvement with Celebrex.  (Defendants' Exhibit B44)(Defendants' Exhibit C1-Shields Affidavit).

On September 6, 2002, plaintiff was informed by Dr. Mandel, the Okaloosa Correctional Institution dentist, that virtually all of his treatment options at the General Dentistry level managing his temporal mandibular disorder (TMD) were exhausted.  Plaintiff was advised that the Oral Surgeon at NFRC would be contacted

to see if any treatment modalities were available. (Defendants' Exhibit B48)(Defendants' Exhibit C1-Shields Affidavit).

On September 10, 2002, Dr. Mandel contacted Dr. Allis at NFRC, who advised that plaintiff had effectively exhausted all possible surgical modalities to treat his TMJ and that NFRC had no further treatment to offer plaintiff.  Plaintiff was informed of this by Dr. Mandel on September 20, 2002, but advised he could continue to seek medical management of chronic pain through medical and/or mental health providers.  (Defendants' Exhibit B49)(Defendants' Exhibit C1-Shields Affidavit).

Plaintiff was referred to the Pain Clinic at NFRC.  On November 8, 2002, Dr. Nabizedah recommended the muscle relaxant Flexoril.  On December 11, 2002, Dr. Mandel noted that the course of Flexoril provided plaintiff some relief.  On  January 9, 2003, plaintiff complained of jaw pain.  Plaintiff was again informed by Dr. Mandel that there were no other treatment options available from the dentistry department and his analgesic and dietary needs were being managed by the medical department.   (Defendants' Exhibit B50-B52)(Defendants' Exhibit C1-Shields Affidavit).

On April 10, 2003, plaintiff was referred to the NFRC Pain Clinic for complaints of chronic TMJ pain. Dr. Nabizedeh recommended plaintiff receive Flexoril and the pain reliever Darvocet with a followup in two weeks. (Defendants' Exhibit B54-B55)(Defendants' Exhibit C1-Shields Affidavit).  Plaintiff was seen again on May 9, 2003, when  Dr. Nabizedeh recommended x-rays of plaintiff's TMJ and to continue with the Flexoril and Darvocet. (Defendants' Exhibit B56-57)(Defendants' Exhibit C1-Shields Affidavit).

Plaintiff's TMJ was x-rayed on May 9, 2003. The TMJ study reflected that there was no evidence of fracture or dislocation and noted that during open mouth maneuver, there was no transition of the condyle (or rounded top portion of the jaw bone) toward the articular eminence on the right side and that the translation of the

left TMJ joint was also limited. (Defendants' Exhibit B58)(Defendants' Exhibit C1-Shields Affidavit).

Plaintiff's puree diet was renewed by Dr. Gerlecz, the Washington Correctional Institution dentist on October 7, 2003. Dr. Gerlecz also instructed plaintiff in facial muscle relaxation through massage. Plaintiff's diet pass was renewed on December 4, 2003, March 4, 2004, June 4, 2004, December 6, 2004, February 4, 2005, April 8, 2005, July 5, 2005, September 7, 2005, and October 7, 2005. (Defendants' Exhibit B53, B59-B66)(Defendants' Exhibit C1-Shields Affidavit, Exhibit C2-Gerlecz Affidavit).

On April 30, 2004, plaintiff was examined by Oral Surgeon Dr. Tabeling. Dr. Tabeling noted that prior to surgery, plaintiff's pain levels were at a level of 9-10 and that his present pain levels ranged from 0-6.6.  Dr. Tabeling observed that plaintiff could open his mouth 25 to 30 millimeters, which is approximately one inch to an inch and one quarter, with minimal pain. Dr. Tabeling recorded that plaintiff had no TMJ tenderness or swelling and his occlusion or alignment of the mandible to the upper jaw was ok.  Dr. Tabeling did not recommend surgery but recommended that plaintiff practice jaw opening exercises.  (Defendants' Exhibit B60)(Defendants' Exhibit C1-Shields Affidavit).

On June 9, 2005,  Dr. Gerlecz referred plaintiff to the Reception and Medical Center for a surgical consult concerning his TMD. (Defendants' Exhibit B62)(Defendants' Exhibit C1-Shields Affidavit, Exhibit C2-Gerlecz Affidavit).

On September 14, 2005, Plaintiff was examined by Dr. Skigen, a Oral Maxillofacial surgeon working under contract with the Florida Department of Corrections.  Dr. Skigen noted plaintiff's complaint of pain and history of TMJ.  Dr. Skigen recommended plaintiff receive non-surgical treatment including splint therapy and NSAIDS. (Defendants' Exhibit B63-B64)(Defendants' Exhibit C1-Shields Affidavit, Exhibit C2-Gerlecz Affidavit).  Plaintiff received the soft mouthguard splint ordered by Dr. Skigen on January 20, 2006.   (Defendants' Exhibit B67-B68) (Defendants' Exhibit C1-Shields Affidavit).

As noted previously, plaintiff has not provided any evidence or argument in rebuttal to the defendant's special report.

<u>Legal Analysis</u>

<u>Summary Judgment Standard</u>

On a motion for summary judgment, this court must evaluate the record in the light most favorable to plaintiff as the nonmovant and grant defendants' motion only if the record demonstrates that there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002); F.R.C.P. 56. The court must resolve all disputes and draw all inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); see also *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir.1999). Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake*, 880 F.2d 348, 351 (11th Cir. 1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.*; *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). Finally, it is improper for the district court to make credibility determinations on a motion for summary judgment. *Miller v. Harget,* 458 F.3d 1251, 1256 (11th Cir. 2006); *Bischoff v. Osceola County,* 222 F.3d 874, 876 (11th Cir. 2000); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987).

### Eleventh Amendment Immunity

Plaintiff does not specifically state whether he sues defendants in their official or individual capacities.  Of course, to the extent plaintiff sues the defendants in their official capacities, they are entitled to Eleventh Amendment immunity.  A suit against a state employee in his or her official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45, 58 (1989).  Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment prohibits a suit against a state in federal court.  *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Gamble v. Florida Department of Heath and Rehabilitative Services*, 779 F.2d 1509, 1511 (11th Cir. 1986). Hence defendants are entitled to Eleventh Amendment immunity to the extent the plaintiff sues them in their official capacities.

### Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Matthews v. Crosby,* ___ F.3d ___, 2007 WL 778796 (11th Cir. 2007) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal citations and quotation marks omitted).  In order to receive the protection of qualified immunity, the government official has the first burden to that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  *Id.* (Citing *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002))). FN4

Once eligibility for qualified immunity is established, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Matthews v. Crosby,* ___ F.3d ___, 2007 WL 778796 (11th Cir. 2007) (citing *Lee*, 284 F.3d at 1194). This step

consists of a two-part inquiry, set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  First, the court must ask, "do the facts alleged show the government official's conduct violated a constitutional right?" *Matthews*, (quoting *Saucier,* 533 U.S. at 201). If a constitutional violation is established, based on the facts in the light most favorable to the plaintiff, the court then must determine whether such conduct would have violated federal law that was clearly established at the time of the incident. *Matthews,* (citing *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing *Saucier*, 533 U.S. at 201-02)).

### Eighth Amendment

Although the United States Constitution does not require comfortable prisons, neither does it permit inhumane ones.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  The Eighth Amendment governs "the treatment a prisoner receives in prison and the conditions under which he is confined. *Hellig v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).  However, "[n]ot every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).  After incarceration, only the 'unnecessary and wanton infliction of pain' . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.  *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations omitted)).

A prison official's deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999).  "However, not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'"  *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting

*McElligott v. Foley,* 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted)); *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The inadvertent or negligent failure to provide adequate medical care "cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105-06. Furthermore, because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian*, 503 U.S. 1, 9 , 112 S.Ct. 995, 1000,  117 L.Ed.2d 156 (1992).  To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry. *Farrow, supra; Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). First, a plaintiff must set forth evidence of an objectively serious medical need.  *Taylor*, 221 F.3d at 1258; *Adams*, 61 F.3d at 1543. Second, a plaintiff must prove that the prison official acted with an attitude of "deliberate indifference" to that serious medical need. *Farmer v. Brennan*, 511 U.S. at 834 (1994); *McElligott*, 182 F.3d at 1254; *Campbell*, 169 F.3d at 1363.

The Eleventh Circuit considers a serious medical need to be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow,* 320 F.3d at 1243 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (quotation marks and citation omitted).  In either instance, the medical need must be "one that, if left unattended, poses a substantial risk of serious harm." *Farrow,* 320 F.3d at 1243 (quoting *Taylor*, 221 F.3d at 1258 (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970)); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970,1977, 128 L.Ed.2d 811 (1994).  Circuit precedent recognizes a range of

medical needs that are sufficiently serious to constitute "serious medical needs" for purposes of the Eighth Amendment and some medical needs that are not.[9]

To satisfy the subjective element of deliberate indifference to a prisoner's serious medical need, plaintiff must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); see also *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) (noting, after *Farmer v. Brennan*, 114 S.Ct. 1970 (1994), that gross negligence fails to satisfy state-of-mind requirement for deliberate indifference)); *Farrow*, 320 F.3d at 1245-46 (citing *McElligott*, 182 F.3d at 1255; *Taylor*, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need"). "Deliberate indifference" and "mere negligence" are not one and the same. Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care. *Murrell v. Bennett*, 615 F.2d 306, 310, n.4 (5th Cir. 1980).

Obviously, a complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. *Harris v. Coweta County*, 21

---

[9]The *Farrow* court cited the following examples: *Adams v. Poag*, 61 F.3d 1537, 1539-41, 1543 (11th Cir. 1995) (asthma, with continual breathing problems and with intermittent wheezing, coughing, and hyperventilating, can constitute a serious medical need), and *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (painful broken foot can be serious medical need), and *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (evidence showing that plaintiff's leg collapsed under him, was deteriorating, caused pain when moved, and that he was virtually unable to walk, supported jury's conclusion that plaintiff had serious medical need), and *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (one-and-a-half-inch cut over detainee's eye bleeding for two and a half hours was a serious medical need), with *Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir. 1986) (inmate's "pseudofolliculitis barbae" or "shaving bumps," even if shaving required by prison officials when physician ordered otherwise, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"), and *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978) (inmate's high blood pressure presented no "true danger" or "serious threat" to his health; he also had full range of motion in his shoulder despite continuing pain from a three-year old injury). See also *Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004) (prisoner's HIV and hepatitis were serious medical needs);

F.3d 388, 393 (11th Cir. 1994).  However, where the inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made.  *Harris v. Thigpen*, 941 F.2d 1495, 1507 (11th Cir. 1991)(quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)).  Disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment.  *Estelle*, 429 U.S. at 107, 97 S.Ct. at 292; *Hamm*, 774 F.2d at 1575.  A difference of opinion over matters of medical judgment does not give rise to a constitutional claim.  *Campbell v. Sikes,* 169 F.3d 1353, 1363 (11th Cir. 1999); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).  Nonetheless, the court can find that the medical treatment was so slight as to amount to no treatment at all, and therefore the mere fact that treatment was provided does not end the inquiry.  *Waldrop*, 871 F.2d at 1035. Similarly, grossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference.  *McElligott*, 182 F.3d at 1255.  For instance, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Farrow,* 320 F.3d at 1246 (quoting *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)).

Alternatively, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow,* 320 F.3d at 1246 (quoting *McElligott*, 182 F.3d at 1255).  "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Bozeman v. Orum*, 422 F.3d 1265, 1272 n. 11 (11th Cir. 2005) (quoting *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994)).  A defendant who delays necessary treatment for non-medical

reasons may exhibit deliberate indifference. *Farrow*, 320 F.3d at 1246 (citing *Hill*, 40 F.3d at 1190 n. 26; *H.C. by Hewett v. Jarrard*, 786 F.2d 1080, 1086 (11th Cir. 1986) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985))). "[D]elay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition and considering the reason for delay." *Hill*, 40 F.3d at 1189. "[A]n official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay." *Bozeman v. Orum*, 422 F.3d 1265, 1272, n. 11 (11th Cir. 2005) (quoting *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997); accord *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th  Cir.1994); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990); *Thomas v. Town of Davie*, 847 F.2d 771, 772 (11th Cir. 1988); *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985)).

### Conclusions of law regarding material facts

The record before this court establishes that this is the quintessential example of a dispute over the adequacy of the medical attention received.  Plaintiff's medical records display a longitudinal picture of the defendants and others attempting to alleviate the plaintiff's complaints with respect to his TMD. He was seen by both general practitioners and at least eight different specialists. (Defendants' Exhibit B2-Dr. Allis, B7-Dr. Shaik, B11-Dr. Winton, B12-Dr. Wagoner, B17-B22-Dr. Dolwick, B42-Dr. Wenk, B60-Dr. Tabeling, B63-B64-Dr. Skigen). MRI's and xrays were taken and two different medical procedures, an arthrocenteses and arthroplasty were performed on plaintiff relevant to his complaints of TMJ pain. (Defendants' Exhibit B12-B13, B17-B22).  He was provided special diets and both OTC and prescription pain relievers.  (See generally Defendants' Exhibit B-B68).  He was referred to Physical Therapy (Defendants' Exhibit B35) and the Pain Clinic (Defendants' Exhibit B50-B57) for his complaints. He was informed by an oral specialist that the TMJ arthroplasty procedure might not provide an improvement. (Defendants' Exhibit B16-

B22).   He was informed after surgery that his symptoms might continue. (Defendants' Exhibit B24-B26).  Further, surgery was not recommended by several oral specialists. (Defendants' Exhibit B26, B44, B60).  Even still, plaintiff was again referred for another evaluation by an oral specialist in June of 2005, who recommended continued non-surgical treatment.  (Defendants' Exhibit B63-B64). Although plaintiff insists that there was an unidentified "$50,000 surgery" that could have alleviated his TMD problems, there is no record evidence that any of the specialists believed there to be a viable surgical alternative to the treatments provided.  Even if there was, as noted above, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made.  See *Harris*, 941 F.2d at 1507 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)).  Disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment.  *Estelle*, 429 U.S. at 107, 97 S.Ct. at 292; *Hamm*, 774 F.2d at 1575.  A difference of opinion over matters of medical judgment does not give rise to a constitutional claim.  *Campbell,* 169 F.3d at 1363. Plaintiff has failed to show deliberate indifference to his serious medical needs that would rise to the level of a constitutional violation.  Having failed to show this, the court need not address the issue of qualified immunity.


        **Accordingly,  it is respectfully RECOMMENDED:**

        That defendants' special report, construed as a motion for summary judgment (doc. 46) be GRANTED, and that the clerk be directed to enter judgment in favor of the defendants Dr. Shields and Dr. Gerlecz, and close the file.


        At Pensacola, Florida, this 11th day of April, 2007.


                        /s/ *Miles Davis*
                        **MILES DAVIS**
                        **UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**